IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CHRISTOPHER REESE, | ) | CASE NO. 5:20-cv-2385 |
| | ) | |
| Plaintiff, | ) | DISTRICT JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Christopher Reese ("Plaintiff" or "Mr. Reese") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Commissioner") denying his

application for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and

Supplemental Security Income ("SSI").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to

42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a

Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the final decision of

the Commissioner be **AFFIRMED**.

## I.    Procedural History

On March 18, 2019, Mr. Reese filed an application for DIB, SSI, and POD.  (Tr. 268-

280.)  He alleged a disability onset date of June 16, 2016.  (*Id.*)  He alleged disability due to knee

injury, traumatic brain injury, post-traumatic stress disorder ("PTSD"), anxiety, depression,

attention deficit disorder, attention deficit hyperactivity disorder ("ADHD"), and bipolar disorder.  (Tr. 147.)  Mr. Reese's application was denied at the initial level (Tr. 164-165) and upon reconsideration (Tr. 194-195), and he requested a hearing (Tr. 218-219).  On March 3, 2020, a hearing was held before an Administrative Law Judge ("ALJ").  (Tr. 34-97.)

On March 20, 2020, the ALJ issued a decision finding that Mr. Reese had not been under a disability within the meaning of the Social Security Act from June 16, 2016 through the date of the decision.  (Tr. 15-28.)  On August 18, 2020, the Appeals Council denied Mr. Reese's request for review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-6.)

On October 20, 2020, Mr. Reese filed a Complaint challenging the Commissioner's final decision.  (ECF Doc. 1.)  The parties have completed briefing in the case.  (ECF Docs. 17, 21, 22.)

## II.    Evidence

### A.    Personal, Educational, and Vocational Evidence

Mr. Reese was born in 1982, and was 33 years old on the alleged disability onset date, making him a younger individual under Social Security Regulations at all relevant times.  (Tr. 27.)  He had at least a high school education.  (*Id*.)  Mr. Reese had not engaged in substantial gainful activity since June 16, 2016, the alleged onset date.  (Tr. 18.)

### B.    Relevant Medical Evidence

#### 1.    Treatment History Prior to Alleged Onset Date

On January 7, 2014, psychologist Peter M. Barach performed a Veteran's Administration ("VA") compensation and pension ("C&P") examination to evaluate Mr. Reese's request for VA disability benefits based on PTSD.  (Tr. 1047-1065.)  Dr. Barach noted that Mr. Reese was previously diagnosed with ADHD, bipolar disorder, and antisocial personality disorder at the time of his discharge from the military in August 2004.  (Tr. 1056.)  In July 2005, he was

2

diagnosed with antisocial personality traits, with a note to rule out malingering and antisocial personality disorder.  (Tr. 1057-1058.)  Based on his 2014 C&P examination, Dr. Barach concluded that Mr. Reese's symptoms did not meet the diagnostic criteria for PTSD, and that Mr. Reese did not have any mental disorders conforming to DSM-5 diagnostic criteria.  (Tr. 1047-1048.)  Instead, the only diagnosis made by Dr. Barach was malingering, which is not a mental disorder diagnosis according to DSM-5.  (Tr. 1048.)  Dr. Barach explained that he was not able to make other diagnoses due to the inconsistencies in Mr. Reese's descriptions of his mental health symptoms, substance abuse, and history, but noted that real psychiatric symptoms may occur alongside simulated or exaggerated symptoms.  (Tr. 1062-63.)  Based on his examination, Dr. Barach concluded that Mr. Reese's report of functional impairment could not be considered reliable.  (Tr. 1065.)

On that same date, Nurse Practitioner Mary Weir conducted a VA C&P examination based on Mr. Reese's request for VA disability benefits for a knee and lower leg condition.  (Tr. 1066-73.)  On examination, NP Weir noted pain with flexion of the right knee, functional limitations of the right knee, reduced strength 4/5 with flexion and extension of his right knee, pain on movement and palpation of both knees, antalgic gait, and otherwise normal findings with no noted instability.  (Tr. 1068-1071, 1073.)  She noted that Mr. Reese had not undergone prior knee surgery, but did regularly use a knee brace.  (Tr. 1071-1072.)  She also noted that there was documented evidence of arthritis in the right knee, but no other significant diagnostic test findings and a normal x-ray of the left knee.  (Tr. 1072-1073.)  Based on her examination, NP Weir concluded that pain, weakness, fatigability, or incoordination could significantly limit Mr. Reese's functional ability during flare ups or repeated use over time in connection with his current service-connected right knee condition.  (Tr. 1073.)  However, she concluded that Mr.

3

Reese did not have a left knee condition or diagnosis secondary to his service-connected right knee condition.  (Tr. 1066-1073.)

On January 7, 2015, Mr. Reese attended a psychiatric medication management visit with Nurse Practitioner Jennifer Spies, having last been seen on July 24, 2014 for depression with a history of polysubstance abuse.  (Tr. 921-925.)  On examination, he was casually dressed with good eye contact and "no limping noted today," exhibiting clear speech, "good" mood with mild depression and anxiety, full range of affect, clear speech, fair memory and cognition, but poor attention span and poor insight and judgment.  (Tr. 923.)  NP Spies continued his diagnosis of depression, refilled his prescriptions for sertraline and bupropion, started him on prazosin, and recommended counseling with psychologist James Mullen.  (Tr. 925.)

Mr. Reese attended mental health counseling with Dr. Mullen on the same day.  (Tr. 919-920.)  On examination, he was logical and coherent, with intact reality testing but a "depressed, irritable isolated" mood.  (Tr. 920.)  He complained of anger because his girlfriend and her children had recently moved out, and described other financial issues.  (*Id*.)  He reported that he was still having military related nightmares from time to time, and "was started / restarted on meds for that." (*Id.*)  He was instructed to return in one month for counseling.  (*Id.*)

He also attended outpatient nursing intake with Licensed Practical Nurse David Ingold that day, complaining of ongoing right knee pain.  (Tr. 920-921.)  LPN Ingold counseled him on the health risks of obesity, but he declined referral to a weight management program.  (Tr. 921.)

On January 29, 2015, Mr. Reese attended a neurology consultation with Dr. Ronald Reichers at the VA traumatic brain injury clinic, reporting ongoing complaints of problems with short term memory, headaches, and sleep.  (Tr. 516-517.)  Neurological examination results were in the normal range except for a visuospatial impairment and delayed recall of 3/5 objects after

five minutes, and 4/5 with prompts.  (Tr. 517-518.)  Physical examination results included a normal gait, normal rise from sitting, and full strength in all extremities, but with pain on right wrist extension.  (Tr. 518.)  Dr. Reichers' assessment noted a personal history of mild traumatic brain injury x2, chronic daily headaches with mixed features, depression, insomnia, and subjective memory complaints.  (*Id.*)  He noted that Mr. Reese's complaints were similar to those at his last TBI assessment, and that his chronic daily headaches likely had a component of analgesic rebound involved.  (*Id.*)  It was noted that he did not follow up with a prior referral to polytrauma behavioral medicine, and was re-referred to behavioral health to address nonpharmacologic therapies and headache education.  (*Id.*)  For his cognitive complaints, Dr. Reichers noted that he tested better at this visit than at the last, both times testing in the normal range.  (*Id.*)  He referred Mr. Reese to speech therapy to provide compensatory memory strategies, but noted that he suspected the memory complaints were connected to insomnia and depression.  (*Id.*)  He ordered a brain MRI in light of the subtle asymmetric neurologic findings and continued headaches.  (*Id.*)  A brain MRI taken on March 5, 2015 was normal.  (Tr. 459-460.)

On February 9, 2015, Mr. Reese attended a consultation with speech pathologist Katherine McGinty, complaining of memory problems.  (Tr. 510-511.)  He reported that he needed to write down information in order to recall it, keeping a daily to-do list, and that he struggled with longstanding issues with attention.  (Tr. 511.)  Ms. McGinty instructed him in various memory strategies and provided related handouts.  (Tr. 512.)  Ms. McGinty noted that Mr. Reese presented with complaints of memory and attention difficulties that impacted his functional cognitive performance, but had several compensatory strategies that he reported were

successful.  (*Id.*)  Ms. McGinty attempted to discuss ways to improve or add to those strategies, but noted that Mr. Reese was skeptical as to whether they would be beneficial.  (*Id.*)

A discharge note for the VA traumatic brain injury clinic dated December 8, 2016 states that a follow up call was scheduled for April 2015, following Mr. Reese's initial evaluation in January 2015; it was reportedly determined at the April 2015 follow up call that no further follow-up was needed.  (Tr. 710-711.)

On July 8, 2015, neurologist Dariush Saghafi completed a C&P examination of Mr. Reese based on his request for VA disability benefits for TBI.  (Tr. 399-406.)  Dr. Saghafi noted Mr. Reese's TBI diagnosis was based on a May 8, 2003 motor vehicle accident with no reported loss of consciousness, but also observed that Mr. Reese reported in 2015 that he did lose consciousness at the time of the 2003 injury.  (Tr. 399-400.)  He also noted Dr. Reichers' assessment at Mr. Reese's initial TBI evaluation in 2012, diagnosing mild traumatic brain injury x2, chronic daily headaches with mixed features, anxiety, and insomnia, with a note to "rule out" PTSD.  (Tr. 400.)  On examination, Dr. Saghafi noted a complaint of mild memory loss, occasionally inappropriate social interaction, subjective symptoms that did not interfere with work or activities of daily living (such as mild or occasional headaches and mild anxiety), but normal motor activity, visual spatial orientation, communication, and judgment, and no neurobehavioral effects.  (Tr. 403-404.)  He noted no significant diagnostic test findings or results, and opined that Mr. Reese's residual conditions attributable to his TBI did not impact his ability to work.  (Tr. 405.)  Instead, Dr. Saghafi agreed with Dr. Riechers' initial assessment that Mr. Reese's "reported headaches, lapses of memory, severe anger management issues, and dyscontrol of actions" were more likely than not related to his peripheral psychological issues as opposed to a direct consequence of his TBI.  (Tr. 405.)  He explained that part of this rationale

was the fact that virtually all of the related behaviors "happened well after the time of the [motor vehicle accident] (up to 2 years after)," while Mr. Reese was able to maintain composure and control over difficult situations in the intervening time.  (*Id.*)  Dr. Saghafi also noted that headaches are typically postconcussive in nature, and are expected to resolve within three years. (*Id.*)  When those headaches persist "across a backdrop of severe PTSD, severe lack of sleep, and nightly nightmares as well as medication overuse," Dr. Saghafi opined that "the headaches are more likely than not the consequence of those behaviors and not the TBI."  (Tr. 406.)

On that same date, Mr. Reese also underwent a C&P examination with internist Daniel J. Abood for knee and lower leg conditions, claiming a service-connected left knee condition resulting from his service-connected right knee condition.  (Tr. 407-416.)  On examination, he exhibited an abnormal range of motion in the left knee with localized tenderness to palpation, but no crepitus, no atrophy, normal strength and stability, and no functional loss resulting from the limited range of motion.  (Tr. 409-412.)  An x-ray of the left knee reflected mild medial compartment narrowing.  (Tr. 415.)  Dr. Abood opined that it would be speculative to connect his left knee condition to the service-connected right knee patellofemoral pain because his pain began about eight years after his discharge, and since that time he had "worked several jobs that can be demanding on the knee joints."  (Tr. 415-16.)

Mr. Reese attended a clinical social work visit with licensed clinical social worker Amanda Swam, LCSW, on December 8, 2015, reporting that he was in the process of moving a washer and dryer to a salvage yard when it caught fire.  (Tr. 796.)  Ms. Swam observed that Mr. Reese was alert and oriented, but that communication was difficult because he was "using tangential communication and avoidance."  (*Id.*)  She advised him to complete an income change

report to reduce his rent due to lack of employment, but noted he "showed no real motivation towards this."  (*Id*.)

     Mr. Reese attended a physical therapy evaluation with Clinical Nurse Specialist Jacqueline Suppan for bilateral knee pain on February 10, 2016, complaining of constant right knee pain and intermittent left knee pain, which worsened with weight-bearing activity.  (Tr. 374-376.)  He reported having hinged knee braces that he wore when he would be on his feet a lot, noting that he volunteered for Goodwill and was seeking employment.  (Tr. 374.)  He also reported that walking was his primary means of transportation because he did not own a car. (*Id*.)  Bilateral knee x-rays from January 26, 2016 showed mild degenerative changes and a small joint effusion with a tiny Baker's cyst.  (Tr. 374-375, 385-386.)  On examination, he exhibited tenderness to palpation of the right knee, normal range of motion of both knees but pain at the end range of right knee flexion and extension, 4-/5 strength with questionable effort, possibly secondary to pain, positive Apley's and Clark's tests on the right, an antalgic gait with decreased stance phase on the right, and right knee hyperextension on the right with an audible "pop/snap" on returning to standing from a squatted position.  (Tr. 375.)

     Mr. Reese was discharged from physical therapy on March 22, 2016 after four visits, complaining of worsening symptoms since starting therapy.  (Tr. 755-756.)  His physical examination findings were similar, but it was noted that he had 5/5 strength throughout, needing verbal encouragement to apply maximum resistance.  (Tr. 756.)  His physical therapist noted that he had not tolerated any progression to weight bearing exercises, but was objectively demonstrating improved lower extremity strength and static balance.  (Tr. 756-757.)  He was referred back to his primary care provider for additional treatment options.  (Tr. 757.)

**2.      Treatment History After Alleged Onset Date**

A new behavioral health interdisciplinary treatment plan was created by LCSW Swam on June 14, 2016.  (Tr. 732-740.)  The plan notes that Mr. Reese was chronically homeless until he was accepted in to the Housing and Urban Development VA Supportive Housing ("HUD VASH") program in 2013, and that he remained "at imminent risk of losing housing" due to a continued failure to pay housing bills such as utilities and rent.  (Tr. 733-734.)  It was also noted that his hygiene and self-care had decompensated significantly in the past six months.  (Tr. 734.)  Mr. Reese was already on his third move on the HUD VASH voucher in less than one year, and LCSW Swam committed to assist Mr. Reese in meeting his goals of maintaining stable housing for a year and obtaining employment.  (Tr. 739-740.)

On September 29, 2016, Mr. Reese met with registered nurse Sessly Oneal-Hale at the VA's Canton Community-based outpatient clinic to pick up medications.  (Tr. 723-724.) He reported that his housing was fine and that he was working on a plan to buy snowblowers from a person that he worked for "on and off" so that he could do snow blowing jobs on his own over the winter.  (Tr. 723.)  He denied consistent work, and did not identify anything that he wanted added to his treatment plan, which was due for renewal.  (*Id.*)

On August 26, 2016, Dr. Mullen noted that Mr. Reese had failed to attend his scheduled counseling appointment.  (Tr. 724.)  On October 11, 2016, a renewal request for prazosin was received, to be addressed at Mr. Reese's next mental health office visit on November 9, 2016. (*Id.*)  On November 9, 2016, Mr. Reese again failed to attend his scheduled counseling and medication management appointments, reporting when contacted that he did not know about the appointments.  (Tr. 720-721.)  He again missed his scheduled behavioral health appointments on

9

January 13, March 23, April 17, June 30, July 26, July 28, August 2, 2017.  (Tr. 659-660, 662-663, 669, 689, 705, 707-708.)

He met with his HUD VASH social worker on February 28, 2017, reporting awareness of an upcoming inspection.  (Tr. 706-707.)  At that visit and subsequent visits on March 24, March 29, April 11, April 12, April 14, April 21, April 26, and May 30, 2017, his mental status examination was noted to be normal, but he remained noncompliant with rules and regulations, being behind on rent and utilities and failing to reach out to HUD VASH staff.  (Tr. 670-671, 679-681, 690-692, 704-705, 707.)  He did not keep his scheduled appointment with HUD VASH on June 30, 2017.  (Tr. 670.)

At a primary care visit with Clinical Nurse Specialist Jacqueline Suppan on March 24, 2017, Mr. Reese complained of right wrist and knee pain and a tooth abscess.  (Tr. 696-700.)  On examination, he demonstrated pain with passive range of motion and rotation of his bilateral knees.  (Tr. 699.)  His diagnoses included bilateral knee pain (on tramadol), healing left knee laceration, tobacco abuse, insomnia, and headaches, with Mr. Reese reporting medications helped when he got them, but with noted medication nonadherence in taking more than recommended medications.  (*Id.*)  An addendum noted that Mr. Reese's urine was positive for cocaine, so that the VA was no longer able to prescribe tramadol.  (Tr. 701.)  Mr. Reese was offered ibuprofen 800 mg and VARC therapy, but refused both.  (*Id.*)

Mr. Reese sought emergency room care for a cut on his left forearm on April 19, 2017. (Tr. 687-88.)  A nurse noted he walked to the hospital, accompanied by a friend, and "does not exhibit signs of gait or balance abnormality."  (Tr. 688.)

Social work notes between July 11 and July 20, 2017 indicate Mr. Reese was in the process of being evicted for nonpayment of rent.  (Tr. 666-669.)  On July 21, 2017, a social

worker visited Mr. Reese at the apartment he was renting, to assist him with filling out a "Request to Move" packet for Summit Metropolitan Housing Authority. (Tr. 665-66.) The social worker noted Mr. Reese had to climb into the apartment through a window, reporting his van had been impounded after police found drugs in the center console with his keys inside. (Tr. 665.) He invited the social worker inside and was polite, but spoke fast and was fidgety and anxious. (*Id*.) She noted various things laying on the front porch and interior floor of the home, including broken vacuum cleaners, car parts, computer, tv, and electronic parts, buckets, and tools. (*Id*.) Mr. Reese indicated he was getting the "gold and silver" from the parts to sell. (*Id*.)

On January 5, 2018, Mr. Reese returned to psychotherapy with Dr. Mullen, reporting an eviction and jail time in since his last appointment. (Tr. 650-651.) He indicated he was no longer working with HUD VASH, but was involved with the Stark County honors court as a result of multiple drug possession charges. (Tr. 651.) On examination, he was cooperative with appropriate grooming, reasonable behavior, normal speech, intact language, normal coherent thought processes, and intact memory, but with anxious mood and constricted affect. (*Id*.)

On January 17, 2018, Mr. Reese attended a primary care office visit to follow up on gastroesophageal reflux disease ("GERD") and headaches, presenting with bilateral knee pain with range of motion on examination. (Tr. 635-640.) His assessment and plan remained similar to his prior visit, but noting no tramadol due to a positive urine drug screen, with a referral to get a right knee brace. (Tr. 637.) He requested a new right knee brace from his physical therapist on that date, but was not fitted with the new brace until May 2, 2018. (Tr. 620, 635.) On January 31, 2018, it was reported that Mr. Reese had been taken into custody following his dismissal from Wilson Hall (Tr. 623.)

Mr. Reese returned to therapy with Dr. Mullen on April 16, 2018, reporting that he had missed his last appointment due to incarceration, but should be out of minimum security prison by July. (Tr. 621.) His mental status findings were unchanged, with anxious mood and constricted affect but otherwise normal findings. (Tr. 622.) He next attended therapy on May 15, 2018, where Dr. Mullen noted he had lost weight and "looks healthier." (Tr. 619.) On examination, he had an anxious mood but otherwise normal findings, including cooperative and reasonable behavior, appropriate grooming, normal speech, intact language, fair range of affect, normal, coherent thought process, and intact memory. (Tr. 620.) He was advised to return in a month. (*Id*.) He failed to appear for his June 13, 2018 counseling session. (Tr. 618.)

On July 12, 2018, a VA social worker met with Mr. Reese at the Lorain Correctional Institution to assess prison reentry needs. (Tr. 617.) He reported he had refused prison mental health care because they were only going to give him two of his medications, and he believed "I have to have all my meds that work in conjunction . . . so what's the point." (*Id*.)

Mr. Reese requested a new knee brace for his right knee on September 28, 2018, reporting that his previous brace no longer fit due to his weight gain. (Tr. 615.) He received the new right brace on December 11, 2018. (Tr. 587.)

On October 3, 2018, Mr. Reese attended a primary care office visit with CNS Suppan, who again noted normal physical examination results except for bilateral knee pain with passive range of motion and rotation, with a weight of 245 pounds. (Tr. 608-610.) He reported recently being released from prison for drug charges, and that he was homeless and without his medications. (Tr. 609.) His assessment continued to note bilateral knee pain with no tramadol due to a positive drug screen, with a note that Mr. Reese had requested knee injections. (Tr.

610.)  On the same date LPN Denise Siegfried counselled him about health risks of obesity, and offered a referral to a weight loss program, which he declined (Tr. 611).

Mr. Reese also attended a rheumatology consultation with Dr. David Lang on the same date for his knee pain.  (Tr. 604-605.)  Dr. Lang recommended new knee x-rays and voltaren gel, with no injections to be performed until the x-rays were complete.  (Tr. 605.)  Diclofenac gel was prescribed at Mr. Reese's request.  (*Id.*)

A social work triage assessment was also conducted on October 3, 2018, after an alert from Mr. Reese's primary care provider that he needed food and housing.  (Tr. 607.)  He stated he was released from prison on September 13, 2018, after taking and selling methamphetamine.  (*Id.*)  He reported an upcoming job interview, and was provided food, bus information, and a recommendation for vocational resources.  (*Id.*)  Mr. Reese did not attend scheduled mental health appointments on October 10 or October 17, 2018.  (Tr. 604.)

Bilateral knee x-rays taken October 4, 2018 revealed mild degenerative changes.  (Tr. 455.)  When compared to x-rays taken in January 2016, they showed slightly increased joint effusion on the right side, and were unchanged on the left.  (Tr. 455-56.)  In an addendum of the same date, Mr. Reese was advised that the rheumatologist did not feel the knee injections were indicated because the "[a]rthritis is only mild."  (Tr. 371.)

Mr. Reese attended a medication management psychiatric visit with Dr. Stephen Miller on October 19, 2018.  (Tr. 601-603.)  His mental status examination results were normal range, and Dr. Miller noted a "good" gait.  (Tr. 601-02.)  He was diagnosed with persistent depressive disorder ("PDD") and polysubstance use, in remission six months.  (Tr. 602.)  Dr. Miller increased prior dosages of Zoloft and prazosin, added melatonin, and discontinued Depakote at

Mr. Reese's request due to weight gain.  (*Id.*)  Mr. Reese failed to attend his counseling appointment with Dr. Mullen on October 26, 2018.  (Tr. 600-601.)

Mr. Reese met regularly with a VA case manager from November 2018 through March 2019.  (Tr. 355-56, 553-599.)  At a November 28, 2018 meeting, his social worker noted that he presented with an angry mood and blunted affect, but with intact short and long term memory, clear, coherent, and logical thought processes, and fair judgment.  (Tr. 588.)  At a December 2, 2018 meeting with his social worker, she noted that he demonstrated slightly irritable mood, rapid and pressured speech, strong affect and no insight; the meeting was held to make sure he attended his Summit Metropolitan Housing Authority intake appointment and to discuss how "this time we could make it work so he does not get evicted again."  (Tr. 567.)

Mr. Reese returned to counseling with Dr. Mullen on December 20, 2018, complaining of problems with nightmares, "being sober," and many thoughts going through his head.  (Tr. 568-569.)  He reported time in jail, use of methamphetamine, and the loss of two jobs.  (Tr. 568.)  He reported being referred to an IOP, but did not take the referral.  (*Id.*)  On examination, his speech was dysarthric, his mood was anxious with a congruent affect, but all other mental status examination findings were in the normal range, including cooperative and reasonable behavior and intact memory.  (*Id.*)  Dr. Mullen instructed Mr. Reese to follow up in one to two months (Tr. 569), but he failed to attend counseling appointments on December 28, 2018, and January 2, March 22, and March 26, 2019.  (Tr. 566-67, 554-55.)

From January through May of 2019, Mr. Reese met regularly with registered nurse / case manager Lawrence Logsdon in the HUD VASH program, who assisted him with securing an apartment, getting furnishings, and applying for a rent waiver regarding housing issues.  (Tr. 365-370, 553-65, 1258-1263.)  By June 17, 2019, Mr. Reese was up to date on rent and having

no issues with his landlord, and was able to move to a "stabilization" phase of support under the HUD VASH program. (Tr. 1240.)

On April 4, 2019, Mr. Reese attended a primary care visit with CNS Suppan, who continued to note the same examination findings of pain with passive range of motion and rotation of the bilateral knees. (Tr. 548-551.) She renewed his dyslipidemia medication, ordered diclofenac gel for his bilateral knee pain, started topiramate for headaches, and advised him to return in six months. (Tr. 550.)

On June 5, 2019, Mr. Reese reported to his social worker that he was experiencing paranoia, nightmares and depression, and was advised to contact his psychiatric medication prescriber. (Tr. 1251.) He was seen the same day by his psychiatrist Dr. Miller. (Tr. 1251-1256.) Dr. Miller noted normal findings on mental status examination, including euthymic mood, appropriate affect, and good insight and judgment. (Tr. 1253-1254.) He also observed that Mr. Reese was walking with a limp, and not wearing his knee brace. (Tr. 1253.) Dr. Miller continued to diagnose PDD and polysubstance use, with remission now noted at 14 months. (Tr. 1255.) He continued Mr. Reese's prescriptions for Zoloft and prazosin, increased his dosage of melatonin, and advised him to return in two months. (*Id*.)

Mr. Reese continued meeting regularly with his social worker for HUD VASH and "SUD" (substance use disorder) from July 2019 through January 2020. (Tr. 1223-1239, 1271-1292, 1304-1305.) On August 2, 2019, he reported that he had not used drugs for "a few months," and was helping his father fix an old camper. (Tr. 1223.) On October 25, 2019, he reported no substance use in the past week, and reported that he was still passing his time by "scrapping," and had a lot of new scrap items in his apartment. (Tr. 1284.) On December 13, 2019, he reported the same, noting that he was sorting scrap items with a friend and preparing to

open a bank account.  (Tr. 1274.)  On January 31, 2020, he reported "on and off substance use"
but denied it was a problem.  (Tr. 1304.)  He was still passing time scrapping, and sorted scrap
items during the home visit.  (*Id*.)

On August 13, 2019, Ms. Reese attended a psychiatric medication management office
visit with Dr. Miller, reporting anxiety, sleep issues, and having several teeth pulled the prior
week. (Tr. 1294-1299.)  On examination, he was alert and oriented, cooperative, kempt, with
normal speech, good eye contact, normal psychomotor activity, grossly intact cognition, coherent
and goal directed thoughts, euthymic mood, appropriate affect, and fair insight and judgment.
(Tr. 1296.)  Dr. Miller continued his Zoloft and melatonin, increased his prazosin, and advised
him to return for follow-up in three to six months.  (Tr. 1298.)  He attended a counseling session
with clinical social worker Neildra Cox, LISW on the same date, reporting financial struggles
and depression.  (Tr. 1292-1294.)  His mental status examination findings were in the normal
range, and he was advised to follow up in six months for a treatment plan update.  (Tr. 1293.)

### 3.  Opinion Evidence

#### i.  Psychiatric Consultative Examination

On March 15, 2019, psychologist Bryan Krabbe, Psy.D., performed a psychiatric
consultative examination of Mr. Reese, including a clinical interview and review of background
materials.  (Tr. 1214-21.)  Mr. Reese reported living alone and spending his time "walk[ing]
around, watch[ing] tv, and clean[ing]."  (Tr. 1217.)  With questioning, he said he could attend to
his daily hygiene, perform household chores, shop for groceries, and prepare basic meals, but
was slowed by physical pain.  (*Id.*)  On mental status examination, he "appeared to be nervous"
and displayed indications of anxiety, such as an apprehensive facial expression.  (Tr. 1217.)  He
also moved at a slow rate of speed and wore a knee brace.  (*Id*.)  However, he was also

cooperative, rapport was easily established, his hygiene was adequate, and he displayed normal speech and thought processes.  (*Id.*)  He was alert and oriented, and had no difficulty following the conversation.  (Tr. 1218.)  His performance on memory tasks was average, recalling 7 digits forward and 5 digits backward, identifying the past three presidents, and calculating division and fractions without difficulty, but remembered 0 of 3 words after a short delay.  (*Id.*)  In terms of attention and concentration, his performance was slightly below average for serial 7s, but average for serial 3s.  (*Id.*)  He performed in the average range for abstract reasoning, his general level of intelligence appeared to fall within the average range, and he displayed adequate insight and judgement.  (*Id.*)  Based Mr. Reese's examination and reported symptoms, Dr. Krabbe diagnosed him with major depressive disorder, unspecified trauma and stressor related disorder, unspecified alcohol related disorder in sustained remission, and unspecified stimulant related disorder in sustained remission.  (Tr. 1219.)  Although Mr. Reese reported memory problems, Dr. Krabbe stated that he could not substantiate a diagnosis of neurocognitive disorder "given the absence of measures of memory function."  (*Id.*)

With respect to understanding, carrying out, and remembering instructions, Dr. Krabbe noted that Mr. Reese performed adequately on tasks to assess understanding instructions and some memory tasks, but below average on recalling digits forward.  (*Id.*)  With respect to concentrating, persisting, and maintaining pace, he noted that Mr. Reese had difficulty with serial 3s and 7s but no difficulty recalling digits backward, and displayed adequate task persistence.  (Tr. 1220.)  With respect to social interactions, he opined that Mr. Reese functioned within adequate limits of intellectual functioning and interacted appropriately on examination, but described mental health problems that may lead to emotional instability.  (*Id.*)  With respect to the ability to deal with pressure, he noted Mr. Reese's appropriate responses and affect on

examination, but previous drug use and reported symptoms that may lead to emotional instability and withdrawal.  (*Id.*)

### ii.    State Agency Reviewers

On May 13, 2019, state agency reviewing physician Steve McKee, M.D., reviewed the record and the prior ALJ decision issued May 21, 2013 (Tr. 104-21).  (Tr. 138-41.)  Dr. McKee determined that no medical evidence of record indicated any significant change in physical functioning, and adopted the prior residual functional capacity ("RFC") determination, which limited Mr. Reese to work at a light level of exertion, under AR-98-4.  (Tr. 138-41.)

On August 22, 2019, state agency reviewing physician Mehr Siddiqui, M.D., reviewed the record and concurred with the opinion of Dr. McKee.  (Tr. 174-76.)

On May 24, 2019, state agency reviewing psychologist Michael E. Cremerius, Ph.D., reviewed the record, concluded that Mr. Reese had severe mental impairments that did not meet the listings, and opined that Mr. Reese had the following mental RFC limitations:

- cognitive capacity to understand and remember simple and detailed instructions, but complex instructions are precluded;

- capable of performing simple and detailed tasks, but complex tasks precluded;

- limited to brief and superficial contact with co-workers and supervisors, and no contact with the public; and

- capacity to adapt to typical changes in the work place, but no fast paced tasks with strict production quotas, although variable paced tasks with end of day production quotas would be acceptable.

(Tr. 136-137, 141-43.)

On August 26, 2019, state agency reviewing psychologist Aracelis Rivera, Ph.D., reviewed the record adopted the mental RFC from the prior ALJ's 2013 decision under AR 98-4.

(Tr. 176-77.)  That RFC limited Mr. Reese to:

> simple, routine, repetitive tasks not performed at a production-rate pace.  The claimant should have minimal interaction with supervisors, co-workers, and the general public; he cannot perform tasks requiring him to engage in arbitration, mediation, or negotiation, and he cannot perform call center or similar work.

(Tr. 176 (quoting Tr. 111).)

**C.     Hearing Testimony**

**1.     Plaintiff's Testimony**

At the March 3, 2020 hearing, Mr. Reese testified that he lived alone and supported himself with his VA benefits and food stamps.  (Tr. 42-43.)  He reported that his VA benefits were recently cut due to an overpayment while he was in jail, and that he made up the difference as best he could by walking around at night collecting scrap metal.  (Tr. 42.)  He also reported having medical insurance, housing assistance, drug counseling, and food assistance from the VA.  (Tr. 43, 83.)  He reported losing his driver's license due to unpaid fines, and that his VA case manager brought him to the hearing.  (Tr. 43.)  He also reported that he used to have a commercial driver's license, but lost it because of an unpaid ticket.  (Tr. 44-45.)

He testified that he could not work because of a combination of physical and mental problems.  (Tr. 56.)  Physically, his most disabling problem was his right knee.  (Tr. 56-57.)  He explained that he originally injured his right knee when he got hit in the back of the knee with a 2x4 in Iraq.  (Tr. 61.)  Before he had his knee brace, he reported that his knee would "go out" so that he could not put pressure on it and it would be "dead weight."  (Tr. 59.)  He reported that he could walk two or three blocks, but not a mile.  (Tr. 58.)  He could stand in one place for no more than ten or fifteen minutes.  (Tr. 60.)  When he was home, he kept his knee elevated about 60% of the time.  (*Id.*)  He reported being told he was too young for a knee replacement, and that his request for knee injections was denied.  (Tr. 61-62.)

He also reported problems with his hands because he was a POW in Iraq for a couple of days, and his captors drove a spike through his hand and hit his hand with a hammer.  (Tr. 63.) He reported dropping things and cutting himself because he had no feeling in his hands.  (*Id*.)

In addition, he reported headaches about twice a week.  (Tr. 85.)  He testified that his headaches caused extreme pain so that he needed to turn off all the lights and wear earplugs for hours, until the headache went away.  (Tr. 86.)  He reported having headaches almost daily until his doctor prescribed Topiramate, when they reduced to about twice a week.  (Tr. 85-86.)  He also reported taking about six Tylenol a day to try to limit his headaches.  (Tr. 86.)

With respect to his mental health issues, he testified that this issue began when he was hit by an IED in Iraq; he also reported being hit in the head during hand-to-hand combat.  (Tr. 64.) When he was around people, he reported feeling paranoia and having the urge to dart and run. (Tr. 65-66.)  He would shake, get cold or clammy, and sometimes stutter.  (Tr. 90.)  He tried to shop when stores were not crowded, and avoided Walmart unless he had no choice.  (Tr. 66.) When he had to, he would shop as quickly as he could.  (*Id*.)  He could manage groups of three to five people, but was not fully comfortable.  (Tr. 67.)  He also reported issues with memory and concentration which were progressively getting worse.  (*Id*.)  He would forget doctors appointments even when they called to remind him the day before.  (Tr. 68.)  He salvaged a dry erase board that he put on his door to write reminders.  (*Id*.)  He also reported zoning out when people were talking to him and missing what they were saying.  (Tr. 70.)  He had nightmares and flashbacks that kept him from sleeping at night.  (Tr. 71.)  He slept only two or three hours a night.  (Tr. 80.)  He reported hearing voices he did not believe other people were hearing, which he believed was because he spent so much time alone.  (Tr. 73.)  The voices were very distracting and prevented him from watching movies or television.  (Tr. 89.)

He acknowledged a history of substance abuse, which he said was a problem "a few years back." (Tr. 73-74.)  He then agreed that he had relapsed "once or twice" in the prior six to eight months, explaining that he got crack cocaine around Christmas because his check was a little bigger.  (Tr. 74.)  He reported that was only the second time he had used drugs since his release from prison.  (Tr. 77.)  He reported that he drank maybe two bottles of whisky in a year.  (Tr. 79.)  He explained that he was kicked out of a drug treatment program at Wilson Hall after he was accused of beating someone up, and that he did not go to the AA meeting in his neighborhood because they were in the area where people go to buy drugs.  (Tr. 84-85.)

With regard to activities of daily living, he testified that he was able to manage his own hygiene, and did household chores the best that he could.  (Tr. 80.)  He lived on the third floor of an apartment building, and pretty much stayed to himself.  (Tr. 81.)  He liked fishing, but last went fishing with his father in 2013.  (Tr. 82.)  Most days, he reported spending his time watching movies or reading.  (*Id*.)  His sister-in-law sometimes helped him at the laundromat, and his VA case manager helped him with rides to the store, getting him food when he ran out, and being someone to talk to.  (Tr. 82-83.)  He said his case manager used to visit weekly, but had started coming less often.  (Tr. 84.)  He also reported that a VA drug counselor came to see him every two weeks.  (*Id*.)

To make up the difference between his benefit check and his rent, and to help him afford cigarettes, he reported that he "scraps metal."  (Tr. 69.)  He explained that he used to scrap by driving a van, and could go through a whole area in two to three hours before he needed a knee brace.  (*Id*.)  By the time of the hearing, he reported that he would instead push a shopping cart on "trash nights," about two or three times a week, and sometimes worked all night.  (Tr. 69.)

He testified that he worked at Specialty Metals Processing in 2012, cutting and grinding big titanium plates.  (Tr. 46.)  It was a three-person team, which was nice because he could not be around a lot of people.  (*Id*.)  He reported that he stood "best I could" at this job, but ended up standing or leaning less than half the time.  (Tr. 47.)  The heaviest thing he lifted was a fifteen pound hand grinder, because the plates were much too heavy to lift without a crane.  (Tr. 48.)

Before Specialty Metals, he worked at Sterilite through a temporary service, pressing and packaging plastic totes and "stuff like that you see at Wal-Mart, little shelves."  (Tr. 48-49.)  He reported standing most of the time at that job, but did not have to lift more than ten pounds.  (Tr. 50.)  Before Sterilite, he reported working for two different truck driving companies, driving big tractor trailers.  (Tr. 51.)  At one of the two jobs he also monitored the loading and unloading, but he never did any lifting or carrying in either job.  (Tr. 52.)  Before the trucking jobs, he reported working as an installer and trainer for Dish Network.  (Tr. 53.)  He usually installed the dishes on poles that were cemented into the ground.  (Tr. 54.)  He was on his feet all day in that job, and had to lift dishes which weighed about 16.3 pounds.  (Tr. 55.)

### 2.    Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing, and classified Mr. Reese's past work as a hand grinder, production assembler, semi-truck driver, and television installer.  (Tr. 92.)

For his first hypothetical, the ALJ asked the VE to assume an individual of Mr. Reese's age and education and with his past work, with the following functional limitations:

> The individual can perform a full range of light work subject to the following limitations.  Specifically, the individual would be limited to occasional climbing of ramps or stairs but would never climb ladders, ropes, or scaffolds.  The individual could occasionally crouch but would never kneel or crawl.  The individual would avoid exposure to unprotected heights or hazardous machinery or commercial driving.  The individual would be limited to the performance of simple, routine tasks but not at a production rate pace such as an assembly line setting.  And the individual would be limited to the performance of simple work-related decisions.

22

> The individual would be limited to occasional interactions with supervisors or coworkers or the general public and would not engage in arbitration, negotiation, mediation, or call center or similar types of work.

(Tr. 93.)

The VE testified that the hypothetical individual would not be able to perform any of Mr. Reese's past work.  (*Id*.)  However, the hypothetical individual could perform representative positions in the national economy, including office cleaner, food service worker, and marker. (Tr. 93-94.)

The ALJ next amended the first hypothetical to provide that the hypothetical individual would have no interactions with coworkers or the general public but would still be limited to occasional interaction with supervisors.  (Tr. 94.)  The VE testified that this was so close to total isolation that it would preclude competitive employment.  (Tr. 94-95.)

For his third hypothetical, the ALJ amended the first hypothetical to include the additional limitation that the individual would be off-task 20% of the day and absent three times per month.  (Tr. 95.)  The VE testified that, based on his experience, the third hypothetical individual would be neither competitive enough nor productive enough to sustain competitive employment.  (*Id*.)  He believed that employers do not have a tolerance for more than 10% of time off task, and the threshold for absenteeism was two days per month.  (Tr. 95-96.)

### III.    Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520;[1]  *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The

---

[1] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501, et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 *et seq*., corresponding to the last two digits of the DIB cite (*i.e.*, 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

burden shifts to the Commissioner at Step Five to establish whether the claimant has the

Residual Functional Capacity ("RFC") and vocational factors to perform other work available in

the national economy.  *Id.*

## IV.  The ALJ's Decision

In his March 20, 2020 decision, the ALJ made the following findings:[2]

1.  The claimant meets the insured status requirements of the Social Security Act through September 30, 2019.  (Tr. 17.)

2.  The claimant has not engaged in substantial gainful activity since June 16, 2016, the alleged onset date.  (Tr. 18.)

3.  The claimant has the following severe impairments: obesity, osteoarthritis of the bilateral knees, traumatic brain injury, major depressive disorder, anxiety, trauma- and stressor-related disorder, alcohol-related disorder and stimulant-related disorder.  (*Id.*)

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id.*)

5.  The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that the claimant may occasionally crouch, climb ramps and stairs, but may never kneel, crawl, climb ladders, ropes or scaffolds; the claimant must avoid all exposure to workplace hazards, including unprotected heights, hazardous machinery and commercial driving; the claimant is limited to the performance of simple, routine tasks, and the making of no more than simple, work-related decisions, undertaken in a work setting free of production-rate pace [as is found in assembly line work], which setting requires no more than occasional interaction with co-workers, supervisors or the general public, but which includes no tasks involving arbitration, mediation, negotiation, "call center" or similar types of work.  (Tr. 21.)

6.  The claimant is unable to perform any past relevant work.  (Tr. 26.)

7.  The claimant was born in 1982 and was 33 years old, defined as a younger individual age 18-49, on the alleged disability onset date.  (Tr. 27.)

---

[2] The ALJ's findings are summarized.

8. The claimant has at least a high school education and is able to communicate in English. (*Id.*)

9. Transferability of job skills is not material to the determination of disability. (*Id.*)

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including office cleaner, food service worker, and marker. (Tr. 27-28.)

Based on the foregoing, the ALJ determined that Mr. Reese had not been under a disability, as defined in the Social Security Act, from June 16, 2016, through the date of the decision on March 20, 2020. (Tr. 28.)

## V. Plaintiff's Arguments

In his brief, Mr. Reese raises two legal issues:

1. The appointment of Andrew Saul as Commissioner of the Social Security Administration violated the separation of powers. As such, the decision in this case by an ALJ who derived his authority from Andrew Saul is constitutionally defective.

2. The ALJ committed harmful error when he failed to support his RFC with substantial evidence and according to the relevant Rulings and Regulations. The ALJ also erred when he relied on the prior ALJ's decision which was issued by an ALJ who had not been properly appointed.

(ECF Doc. 17, p. 1.)

## VI. Law & Analysis

### A. Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. *See Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

26

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)); *see also Blakely*, 581 F.3d at 406. The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

"'The substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakely*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *Blakely*, 581 F.3d at 406 ("[I]f substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'") (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Even where an ALJ decision is supported by substantial evidence, the Sixth Circuit explains the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant

of a substantial right.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009)

(quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007); citing *Wilson v.

Comm'r of Soc. Sec.* 378 F.3d 541, 546-547 (6th Cir. 2004)); *see also Rabbers*, 582 F.3d at 654

("Generally, … we review decisions of administrative agencies for harmless error.").  A decision

will also not be upheld where the Commissioner's reasoning does not "build an accurate and

logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875,

877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.      First Assignment of Error: Whether Plaintiff Has Standing to Challenge ALJ
Decision Based on Alleged Separation of Powers Violation by the Commissioner**

Mr. Reese argues that the ALJ decision here is "constitutionally defective" because the

appointment of the former Commissioner of Social Security violated separation of powers

principles.  (ECF Doc. 17 p. 10.)  Specifically, he argues, based on *Seila Law LLC v. Consumer

Fin. Prot. Bureau*, —— U.S. ——, 140 S. Ct. 2183, 207 L.Ed.2d 494 (2020), that the statute under

which the former Commissioner was appointed violated separation of powers principles by

allowing him to serve a longer term than the President of the United States while protecting him

from removal except for cause, similar to the statute found unconstitutional in *Seila Law*.  (ECF

Doc. 17 p. 10 (challenging 42 U.S.C. § 902(a)(3)).)  Mr. Reese argues, based on this precedent,

that the ALJ's authority to issue the decision in this case was "constitutionally defective"

because his authority was delegated from the Commissioner, and because the ALJ's decision was

improperly based on regulations promulgated by the former Commissioner without authority.

(ECF Doc. 17 pp. 10-11.)

The Commissioner does not dispute that the relevant removal provision "violates the

separation of powers to the extent it is construed as limiting the President's authority to remove

the Commissioner without cause" (ECF Doc. 21 p. 9 (citing Office of Legal Counsel, U.S. Dep't

28

of Justice, Constitutionality of the Commissioner of Social Security's Tenure Protection, 2021 WL 2981542 (July 8, 2021)), but argues that Mr. Reese is not entitled to relief because "even where an unconstitutional statutory removal restriction exists, a plaintiff seeking relief on that basis must show that the restriction actually caused [him/her] harm." (ECF Doc. 21 pp. 9-10 (citing *Collins v. Yellen*, ⸺ U.S. ⸺, 141 S. Ct. 1761, 1787-89, 210 L.Ed.2d 432 (2021)).) More specifically, the Commissioner argues that Mr. Reese cannot show harm to support his claim for relief because the ALJ's appointment was ratified by an Acting Commissioner who was not subject to the challenged removal restriction, and because Mr. Reese cannot show that the removal restriction caused the denial of his benefits.  (ECF Doc. 21 p. 10.)

Having considered the arguments of the parties and the applicable law, the undersigned agrees with numerous other courts that Mr. Reese's constitutional challenge to a statutory removal provision for the Commissioner of Social Security suffers from a fundamental deficiency in this individual Social Security disability appeal, namely that Mr. Reese lacks standing to assert the challenge.[3]  *See Miley v. Comm'r of Soc. Sec.*, No. 1:20-cv-2550, 2021 WL 6064754, *9 (N.D. Ohio Dec. 22, 2021); *Rhouma v. Comm'r of Soc. Sec.*, --- F.Supp.3d ---, 2021 WL 5882671, at *10 (N.D. Ohio Dec. 13, 2021); *Catherine JSW v. Comm'r of Soc. Sec.*, No. 3:20-cv-5602 , 2021 WL 5276522, *8 (W.D. Wash. Nov. 12, 2021); *Melvin S. v. Comm'r of Soc. Sec.*, No. 20-5978, 2021 WL 6072564, at *11 (W.D. Wash. Dec. 22, 2021); *Helms v. Comm'r of Soc. Sec.*, No. 3:20-CV-589-MOC, 2021 WL 5710096, at *3 (W.D.N.C. Dec. 1, 2021); *Cooper v. Saul*, No. 21-CV-38-CJW-MAR, 2021 WL 2908112, at *2 (N.D. Iowa July 9, 2021).

[3] The Commissioner also argues that Plaintiff's request for relief under *Seila Law* fails under other legal and equitable doctrines, including harmless error, de facto officer, the rule of necessity, and broad prudential considerations.  (ECF Doc. 21 pp. 16-21.)  Because the undersigned concludes that this Court does not have standing to hear the relevant constitutional arguments, these additional arguments will not be addressed herein.

Standing is a threshold issue, and a failure to establish standing means a court cannot address the merits of a claim. *See Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 94, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) ("Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the case.")  Although the Commissioner did not directly challenge Mr. Reese's standing in this case, this Court has the ability and the obligation to raise the issue of standing *sua sponte* where it is in doubt. *See Loren v. Blue Cross & Blue Shield of Mich.*, 505 F.3d 598, 607 (6th Cir. 2007) ("Because the standing issue goes to this Court's subject matter jurisdiction, it can be raised *sua sponte*.").  Indeed, "[a]s a jurisdictional requirement, standing ... cannot be waived or forfeited." *Virginia House of Delegates v. Bethune-Hill*, ––– U.S. ––––, 139 S. Ct. 1945, 1951, 204 L.Ed.2d 305 (2019).  Moreover, it is noted that the primary defect challenged by the Commissioner in her briefing – that Mr. Reese did not suffer actual harm caused by the statutory removal provision – is also a key element of the standing analysis discussed herein. (ECF Doc. 21 pp. 13-16.) *See also Rhouma*, --- F.Supp.3d ---, 2021 WL 5882671, at *10 (raising standing *sua sponte* when "the Commissioner doesn't use the word 'standing,' [but] argues that [the plaintiff] has not established a 'nexus' between § 902(a)(3)'s removal restrictions and an alleged harm," and "has effectively argued that [the plaintiff] has not met the traceability requirement for standing").

As explained in *Collins*, a plaintiff must satisfy a three-pronged test to establish Article III standing, namely: "[he] must show that [he] has suffered an 'injury in fact' that is 'fairly traceable' to the defendant's conduct and would likely be 'redressed by a favorable decision.'" 141 S. Ct. at 1779 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561, 112 S.Ct.

2130, 119 L.Ed.2d 351 (1992)); *see also Cleveland Branch NACP v. City of Parma*, 263 F.3d

513, 523–24 (6th Cir. 2001); *Gerber v. Herskovitz*, 14 F.4th 500, 505 (6th Cir. 2021).

 Under the second "traceability" prong, the Supreme Court held in *Collins* that a plaintiff

challenging a statutory removal provision for an executive officer could demonstrate standing

"by showing that [he] was harmed by an action that was taken by such an officer and that the

plaintiff alleges was void."  141 S. Ct. at 1788, n. 24; *see also Collins*, 141 S. Ct. at 1779

(finding standing to challenge statutory removal protection for FHFA Director when alleged

financial injury was traceable to the FHFA's adoption and implementation of a policy that

deprived defendants of shareholder profits) (quoting *Seila Law*, 140 S.Ct. at 2196 (("In the

specific context of the President's removal power, we have found it sufficient that the challenger

sustains injury from an executive act that allegedly exceeds the official's authority" (brackets and

internal quotation marks omitted))).  However, the Court explicitly clarified that this "holding on

standing does not mean that actions taken by such an officer are void *ab initio* and must be

undone."  141 S. Ct. at 1788, n. 24.

 As the party invoking federal jurisdiction in this case, Mr. Reese bears the burden of

establishing standing for each claim and form of relief.  *See Loren*, 505 F.3d at 607 (citing *Lujan

v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992));

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352, 126 S.Ct. 1854, 1867, 164 L.Ed.2d 589

(2006).  Mr. Reese argues that the requirements for standing are met because the Commissioner

did not argue otherwise, and for the reasons set forth in two district court cases addressing

similar constitutional challenges.  (ECF Doc. 22 p. 22 (citing *Brinkman v. Kijakazi*, No. 5:21-cv-

076, 2021 WL 4462897, at *2 (D. Nev. Sept. 9, 2021) and *Sylvia v. Kijakazi*, No. 5:21-CV-076-

M-BQ, 2021 WL 4692293, at *3 (N.D. Tex. Sept. 13, 2021), *report and recommendation*

31

*adopted*, No. 5:21-CV-076-M-BQ, 2021 WL 4622528 (N.D. Tex. Oct. 7, 2021).) Given that

standing cannot be waived or forfeited, the pertinent question is whether Mr. Reese has

successfully demonstrated that the "traceability" requirement is met in this case.

The court in *Brinkman* did face a similar challenge to an ALJ decision based on the

alleged unconstitutionality of the statutory removal provision for the Commissioner of Social

Security under *Seila Law*. 2021 WL 4462897, at *1. And contrary to the argument offered by

Mr. Reese in this case, the *Brinkman* court held: "Plaintiff cannot establish traceability. <u>Because</u>

<u>Plaintiff cannot demonstrate traceability, she lacks standing to bring her constitutional</u>

<u>challenge</u>." *Id.* at *2 (emphasis added). Citing to *Collins* and *Seila Law*, the court explained:

"Because Plaintiff offers nothing that traces the decision by the ALJ in her case to any alleged

injurious conduct by the SSA Commissioner, she has not demonstrated traceability and her

constitutional violation claim fails for lack of standing." *Id.* (citing *Seila Law*, 140 S.Ct. at 2196

and *Collins*, 141 S.Ct. at 1779). This case clearly does not support a finding that Mr. Reese has

demonstrated standing to pursue his constitutional claim in this case.

In contrast, the court in *Sylvia* found that the "traceability" requirement was met for a

similar challenge "[b]ecause the ALJ derives authority directly from the Commissioner, and the

ALJ's disability determination becomes the Commissioner's final decision." 2021 WL 4692293,

at *3. In so finding, the court relied in part on another court's observation that "[i]f the removal

protections afforded the Commissioner violate the constitutional requirement of separation of

powers, the Commissioner has no authority to delegate." *Id.* (quoting *Tafoya v. Kijakazi*, No.

21-CV-00871-REB, 2021 WL 3269640, at *5 (D. Colo. July 29, 2021)). Indeed, the *Tafoya*

court went on to state: "Under those conditions, the ALJs themselves ostensibly are operating

without constitutional authority, and their disability determinations – which again, are the decisions of the Commissioner – arguably are null." *Tafoya* 2021 WL 3269640, at *5.

Consistent with the findings in *Sylvia* and *Tafoya*, Mr. Reese asserts that the ALJ decision here was "constitutionally defective" because the ALJ's authority was delegated by the Commissioner.  (ECF Doc. 17 p. 10.)  In other words, he contends that the ALJ lacked authority to issue the present decision because the Commissioner lacked the ability to delegate that authority to him.  However, such a finding is in direct conflict with the Supreme Court's conclusion in *Collins* that the unlawfulness of a similar removal provision did not strip the relevant executive officer "of the power to undertake the other responsibilities of his office." 141 S. Ct. at 1788 n. 23 (citing *Seila Law*, 140 S.Ct. at 2207-2211).  The *Collins* Court explained because the relevant statute "unconstitutionally limited the President's authority to *remove*" the officer, but "there was no constitutional defect in the statutorily prescribed method of appointment to that office," there was accordingly "no reason to regard any of the actions taken by the [agency] … as void."  *Id.* at 1787 (emphasis in original).  In so finding, the Court distinguished prior separation of powers decisions involving "a Government actor's exercise of power that the actor did not lawfully possess," including the holding in *Lucia v. S.E.C.*, 138 S. Ct. 2044 (2018) that certain administrative law judges were appointed in violation of Appointments Clause.  *Id.* at 1788 (citations omitted).  Thus, the Court distinguished the impact of an unlawful appointment clause – as in *Lucia* – from an unlawful removal clause – as in *Seila Law*, *Collins*, and the present case.

Based on the Supreme Court's explicit findings in *Collins*, there is no legal basis for the undersigned to conclude that actions of the SSA Commissioner or the ALJ in this case were automatically void or lacking in authority.  Thus, the determination must return to the question

33

whether Mr. Reese was "harmed by an action that was taken by [the SSA Commissioner] and that [he] alleges was void." *Collins*, 141 S. Ct. at 1788, n.24.  In addition to arguing that the ALJ lacked delegated authority to issue his decision, Mr. Reese asserts that the ALJ decided this case "based on regulations promulgated by Mr. Saul when he had no authority to issue the same," and more specifically that the former Commissioner "implemented changes in HALLEX which modified the way in which decisions were written (I-2-3-20 in effect July 17, 2019)" and "modified the way in which musculoskeletal impairments are evaluated (DI 34121.013 and DI 34121.015."  (ECF Doc. 17 p. 10; ECF Doc. 22 p. 4.)

First, Mr. Reese's arguments on this point are underdeveloped, as he has given no argument or explanation as to how the identified actions by the Commissioner are traceable to any harm suffered in the present case.  To demonstrate standing, Mr. Reese must show that the policy and/or regulatory changes implemented by the former Commissioner adversely affected him.  *See Lujan*, 504 U.S. at 559 n.1 ("[T]he injury must affect the plaintiff in a personal and individual way.").  Second, even a cursory review of the actions of the former Commissioner identified by Mr. Reese reflects that those actions are not traceable to harm asserted by Mr. Reese in this case.  As to the identified changes to HALLEX, an internal procedural manual for the Social Security Administration, the cited change pertains to the way that Office of Hearings Operations staff will respond when a notice of hearing acknowledgement is not returned.  *See* HALLEX I-2-3-20.[4]  No challenge is raised in this case regarding deficiencies with the notices of hearing.  As to the identified changes to the musculoskeletal listings, it is evident that the

---

[4] The February 23, 2021 revision of HALLEX I-2-3-20 "updated and clarified the action that Office of Hearings Operations (OHO) staff will take if a claimant or appointed representative does not return an acknowledgment of the notice of hearing."  Transmittal I-2-240, Soc. Sec. Admi. Office of Analytics Review and Oversight, available at https://www.ssa.gov/OP_Home/hallex/TS/tsi-2-240.html#:~:text=This%20transmittal%20amends%20section%20I-2-3-20%20of%20the%20Hearings%2C,404.938%20and%20416.1438.%20Explanation%20of%20Content%20and%20 Changes (last visited 1/12/2022).

identified changes took effect on April 1, 2021, more than one year after the ALJ's decision in this case (Tr. 28), and thus could not have impacted this decision. *See* DI 34121.013.[5]  Unlike the shareholders in *Collins*, whose injury – the loss of net worth in companies in which they owned shares – was directly traceable to the Federal Housing Finance Agency Director's amendment of the formula to calculate dividends, here Mr. Reese has not demonstrated that the regulatory changes he identifies impacted the denial of benefits. *Collins*, 141 S. Ct. at 1779.

Consistent with the findings of other courts, the undersigned therefore concludes that Mr. Reese has failed to establish that he has suffered harm traceable to an unlawful action by the former Commissioner of Social Security, and has accordingly failed to establish standing to pursue this constitutional challenge. *See, e.g., Rhouma v. Comm'r of Soc. Sec.*, --- F.Supp.3d. ---, 2021 WL 5882671 at * 11 ("Without a harm traceable to an unlawful action by the Commissioner, [plaintiff] does not have standing to challenge the constitutionality of § 902(a)(3)."); *Catherine JSW*, 2021 WL 5276522 at *8 ("Because Plaintiff has not shown any compensable harm fairly traceable to the actions of former Commissioner Saul, under *Collins v. Yellin,* 594 S. Ct. 1761,1788 (2021), the Plaintiff's situation is distinguishable from the plaintiff's claims in *Collins*; Plaintiff has failed to establish standing and the Court need not address the Plaintiff's or Defendant's additional arguments."); *Helms*, 2021 WL 5710096 at *3 ("The Court finds that it is implausible that the Commissioner's protection from removal from office, whether constitutional or not, could have affected ALJ Goodson's decision or any other aspect of the administrative litigation in a material way. Because Plaintiff has not shown that she was in any way injured by the removal protection provision, she does not have standing to litigate its constitutionality.").

---

[5] https://secure.ssa.gov/poms nsf/lnx/0434121013 (last visited 1/12/2022).

Because the undersigned concludes that Mr. Reese does not have standing to proceed with his separation of powers constitutional claim, the undersigned recommends that the Court deny Mr. Reese's request for a remand based on the asserted constitutional challenge.

**C.    Second Assignment of Error: Whether ALJ Erred by Failing to Support the RFC with Substantial Evidence, by Failing to Follow SSA Rulings and Regulations, or by Relying on a Prior ALJ Who Was Not Properly Appointed**

Under the umbrella of what is described as a single assignment of error, Mr. Reese has attempted to raise numerous discrete and unrelated arguments in a manner that is neither clear nor appropriately developed.  (ECF Doc. 17 pp. 11-22.)  While the undersigned has undertaken to parse out those arguments that meet at least the bare minimum of requirements to identify an issue for determination by this Court, it is noted that:

> [I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones.

*McPherson v. Kelsey*, 125 F.3d 989, 995–996 (6th Cir. 1997); *see also Hough v. Comm'r of Soc. Sec.*, No. 12-14678, 2014 WL 764634, at *9 (E.D. Mich. Feb. 25, 2014) (relying on *McPherson* when noting plaintiff did not sufficiently present her claimed errors); *Ray v. Saul,* No. 1:19-CV-01880, 2020 WL 5203493, at *10 (N.D. Ohio Sept. 1, 2020) (finding conclusory and undeveloped arguments waived).  This report and recommendation will not address issues simply referenced in passing, without an appropriately developed argument.

Upon review of Mr. Reese's brief, the undersigned has determined that the following issues were sufficiently identified and argued: (1) whether the ALJ's finding that Mr. Reese did not meet or medically equal certain mental Listings was supported by substantial evidence (ECF Doc. 17 pp. 17-18); (2) whether the ALJ properly considered headaches under Social Security Ruling 19-4p (*Id.* at pp. 19-20); (3) whether the ALJ properly analyzed Mr. Reese's obesity

under Social Security Ruling 19-2p (*Id.* at p. 16); and (4) whether the ALJ properly assessed the residual effects of Mr. Reese's pain (*Id.* at pp. 21-22). The undersigned will also briefly address Mr. Reese's challenge to the constitutionality of the 2013 prior ALJ decision. (*Id.* at p. 12.) Each of these arguments will be addressed in turn below.

Any other issues identified by Mr. Reese were raised in a perfunctory manner, without developed argument, and are therefore deemed waived. *McPherson*, 125 F.3d at 995–996. Counsel is strongly cautioned that the continued practice of briefing cases in this unclear and underdeveloped manner may result in further waiver of arguments on appeal.

### 1.      Whether Plaintiff May Challenge Constitutionality of 2013 ALJ Decision

In a somewhat tortured attempt to expand on his constitutional arguments in Section VI.B., *supra*, Mr. Reese also seeks to assert a time-barred challenge to the appointment of the ALJ who issued his 2013 disability decision, arguing that "this issue was not forfeited" because the Supreme Court and Sixth Circuit recently decided "that claimants are not required to exhaust certain issues in administrative proceeding [sic] to preserve them for judicial review." (ECF Doc. 17 p. 12 (citing *Carr v. Saul*, 141 S.Ct. 1352, 1362 (2021) and *Ramsey v. Comm'r of Soc. Sec.*, 973 F.3d 537, 547 (6th Cir. 2020).) This argument is without merit.

The Supreme Court in *Carr* addressed a very narrow question: "whether [Social Security disability] petitioners forfeited their Appointments Clause challenges by failing to make them first to their respective ALJs." *Carr*, 141 S. Ct. at 1356. The Court determined that Social Security disability claimants were "not required to exhaust certain issues in administrative proceedings to preserve them for judicial review," and therefore concluded that "claimants who raise those issues for the first time in federal court are not untimely in doing so." *Id.* at 1362.

The cited cases would support Mr. Reese if his argument were that he failed to challenge the appointment of the ALJ who issued the March 20, 2020 decision that is before this Court,

and wished to raise that new challenge in the present appeal. But that is not the relief Mr. Reese seeks. Instead, he seeks to raise a constitutional challenge to a 2013 ALJ decision that is not before this Court, and which has evidently been a final decision of the Social Security Administration for nearly a decade. Mr. Reese has cited no authority to support such relief.

The evidence reflects that the prior ALJ decision Mr. Reese now seeks to challenge was issued on May 21, 2013 (Tr. 117), and the Appeals Counsel denied Mr. Reese's request for review on August 19, 2013 (Tr. 122-127), making the 2013 ALJ decision the final decision of the Commissioner on that date. While there is no evidence of record relating to any federal court appeal, it is noted that any such appeal was required to be filed "within sixty days after the mailing … of notice of" the final decision of the Commissioner. *See* 42 U.S.C.A. § 405(g). Because Mr. Reese's challenge to the appointment of the prior ALJ relates to a final decision of the Commissioner that was not timely challenged and that is not presently before this Court, the undersigned finds this argument to have no merit.

### 2. Whether ALJ Erred in Determining that Mr. Reese Does Not Meet or Medically Equal Listings 12.04, 12.06, or 12.15

Mr. Reese asserts that the ALJ failed to support his finding that Mr. Reese did not meet or medically equal Listings 12.04, 12.06, or 12.15 with substantial evidence. (ECF Doc. 17 pp. 17-18.) These Listings deal with the following mental disorders: depressive, bipolar and related disorders (12.04); anxiety and obsessive-compulsive disorders (12.06); and trauma- and stressor-related disorders (12.15). C.F.R. Pt. 404, Subpt. P, App. 1 § 12.04, 12.06, 12.15. Mr. Reese argues the ALJ provided only a "minimal analysis of the voluminous VA records documenting Reese's difficulties with maintaining housing and other issue[s]," and failed to adequately articulate the basis for his Step Three finding. (ECF Doc. 17 p. 17.)

All three of the Listings at issue here incorporate identical paragraph B and paragraph C criteria, which is an analysis used to rate the severity of mental impairments in four general areas of functioning at Steps Two and Three of the sequential evaluation process.  20 C.F.R. Pts. 404, 416.  Paragraph B defines four broad mental functional areas: "Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself," and requires that a claimant show extreme limitation in one area, or marked limitation in two areas in order to meet a listing.  20 C.F.R. § 416.920a(c)(3), *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00E.  As Mr. Reese's arguments focus on the "B" criteria, those are the criteria that will be addressed herein.

Mr. Reese argues that the ALJ erred in finding that he had mild or moderate limitations in three of the four "B" criteria areas of mental functioning, and should instead have found that he "was seriously limited in his ability to independently, appropriately, effectively, and on a sustained basis understand, remember or apply information, concentrate, persist or maintain pace, and adapt or manage himself."  (ECF Doc. 17 p. 17.)  The only "B" criteria finding not challenged by Mr. Reese was the ALJ's determination that he had a moderate limitation in interacting with others.  (Tr. 19-20.)  The Commissioner responds that the ALJ was supported by substantial evidence in finding that Mr. Reese had no marked or extreme limitations in mental functioning, and that this Listings argument constitutes an impermissible request for this Court to reweigh the evidence.  (ECF Doc. 21 p. 25.)

Notably, the inquiry required here is whether the ALJ's findings were supported by substantial evidence, not whether the evidence could possibly support greater impairment.  *See Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012) ("As long as the ALJ cited substantial, legitimate evidence to support his factual conclusions, we are not to second-guess:

39

'If the ALJ's decision is supported by substantial evidence, then reversal would not be warranted even if substantial evidence would support the opposite conclusion.'") (quoting *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)).

The ALJ in this case provided a detailed analysis in support of his findings regarding Mr. Reese's level of limitation in each of the three challenged "B" criteria functional areas, with citations to specific evidentiary support for each finding, as follows:

> In understanding, remembering or applying information, the claimant has a mild limitation. The claimant has reported difficulties with written instructions (B5E/6), and in session with the consultative examiner, exhibited below average short-term memory (B4F/6). However, during the initial interview for this claim, the field office interviewer noted no perceivable difficulties with the claimant's understanding or coherency (B4E/3). The claimant concedes the ability to follow oral instructions without difficulties (B5E/6). The claimant is a high school graduate, achieved without receipt of special education services (B3E/3) and was assessed by the consultative examiner as possessed of average intelligence (B4F/6), with adequate receptive language (B4F/5). During that examination, the claimant was able to recall seven digits forward and five in reverse (B4F/5), and multiple treatment notes describe the claimant's memory function as intact (B3F/125, 138, 176), (B6F/24).

> * * * *

> With regard to concentrating, persisting or maintaining pace, the claimant has a moderate limitation. The claimant has reported a fifteen-minute attention span, and that he cannot finish what he starts (B5E/6). In session with the consultative examiner, he had difficulties with 'serial seven' and 'serial-three' subtraction tasks (B4F/5). However, during the initial interview for this claim, the field office interviewer reported no perceivable difficulties with the claimant's concentration (B4E/3). The claimant is a high school graduate, achieved without receipt of special education services (B3E/3) and was assessed by the consultative examiner as possessed of average intelligence (B4F/6), with satisfactory attention and concentration (B4F/6). During the examination, the claimant was able to recall seven digits forward and five in reverse (B4F/5). He exhibited good effort on the mental status tasks (B4F/4), and other treatment notes describe the claimant as attentive (B6F/24), with a coherent and logical thought process (B3F/138), (B6F/27).

> As for adapting or managing oneself, the claimant has experienced a moderate limitation. The claimant has described reacting poorly to stressors or changes (B5E/7). Rare treatment notes describe questionable judgment (B3F/135).

> However, treatment notes typically describe fair to good insight and judgment
> (B3F/138, 158), (B4F/5), (B6F/27), and in session with the consultative examiner,
> the claimant did not describe difficulties managing stressors at work (B4F/3). The
> claimant is able to manage an independent household (B5E/1). He is able to attend
> to his self-care, to perform typical household chores, including cleaning, washing
> dishes, preparing simple meals and laundering clothing. The claimant is able to use
> public transportation, and to walk in order to perform household errands. He is able
> to shop in stores, manage his own medications, to read, watch television and play
> video games or pleasure (B3E/1), (B5E), (B4F/4). The claimant has worked part-
> time since the inception of this claim (B6D), and continues to "scrap" metal for
> cash (B3F/212), (B7F/1).

(Tr. 19-20.)

Mr. Reese argues the above assessment constituted a "minimal analysis" of voluminous VA treatment records, and failed to take into account adverse findings by the psychiatric consultative examiner regarding memory and attention. (ECF Doc. 17 pp. 17-18.) In fact, a review of the citations in the above analysis shows that the ALJ cited the VA records multiple times, as all citations to B3F, B6F, and B7F refer to VA treatment records, and made several specific references to assessments during HUD VASH housing program visits. (*See* B3F/135 (Tr. 579), 138 (Tr. 582), 212 (Tr. 656), B7F/1 (Tr. 1304).) He also referenced numerous findings from Mr. Reese's psychiatric consultative examination, cited as B4F, including explicit references to Dr. Krabbe's findings of "below average short-term memory" and "difficulties with 'serial seven' and 'serial-three' subtraction tasks." (*See* B4F/5-6 (Tr. 1218-1219).)

It is true that the ALJ's discussion of the mental functional domains does not specifically reference external stressors that included periods of incarceration and homelessness. Nor does it specifically describe Mr. Reese's participation in VA's prison reentry program (Tr. 578, 617) or the HUD VASH housing program (*see, e.g.,* Tr. 665, 734, 740, 796). But the records show that such care was focused on assisting Mr. Reese with gaining employment and stable housing, rather than treating underlying mental impairments, as it repeatedly identifies treatment goals of

"obtain" or "maintain housing" and "obtain employment."  (*See, e.g.,* Tr. 431, 553, 555-66, 573, 739-40, 1223, 1276.)  Further, it is noted that the same records that document his need for housing assistance state that he is capable of living independently (Tr. 474) and managing his own medication, hygiene and activities of daily living (Tr. 483, 497).  They also describe his mental health symptoms as "mild," and note he has "moderate difficulty in functioning due to mental health problems."  (*See, e.g.,* Tr. 574.)

Accordingly, the undersigned concludes that the VA records describing Mr. Reese's "difficulties with maintaining housing and other issues" (ECF Doc. 17 p. 17) are not inconsistent with the moderate limitations found by the ALJ.  As other courts have noted, when a plaintiff is experiencing stressors such as homelessness, the court must acknowledge "the possibility that the [Plaintiff]'s alleged mental symptoms are solely attributable to or chronically exacerbated by acute and chronic situational stressors rather than [his] mental impairments."  *Hoffer v. Comm'r of Soc. Sec.*, No. 2:20-CV-4763, 2021 WL 3700492, at *4 (S.D. Ohio Aug. 20, 2021), *report and recommendation adopted*, No. 2:20-CV-4763, 2021 WL 5042675 (S.D. Ohio Oct. 29, 2021).

The records reflect that Mr. Reese participated in the HUD VASH program at intervals since 2013, at several times receiving significant interventions and assistance with housing-related needs through that program.  (*See, e.g.,* Tr. 355-356, 365-370, 553-599, 666-671, 679-681, 690-692, 704-707, 732-740, 1223-1240, 1251, 1258-1263, 1271-1292, 1304-1305.) However, the records also reflect that he received only limited and sporadic mental health treatment during that same time, with intermittent psychiatric and counseling visits, and no emergent care or hospitalizations for his mental health impairments.  Specifically, the records reflect that Mr. Reese missed psychiatric medication management and counseling visits throughout 2016 and 2017 (Tr. 659-660, 662-663, 669, 689, 705, 707-708, 720-721, 724), and

only attended a few such visits in 2018 and 2019 (Tr. 554-555, 566-569, 600-604, 618-622, 650-651, 1253-1255, 1294-1299).  At those visits, the most significant objective findings noted by his providers were an anxious or dysthartic mood and/or constricted affect, with all other mental status examination findings being normal.  (Tr. 568, 601-602, 620, 622, 651, 1253-1254, 1293, 1296.)

Mr. Reese's reference to a single note in June 2016 that Mr. Reese's "hygiene and self-care had decompensated significantly in the past 6 months" (ECF Doc. 17 p. 18 (citing Tr 734)) does not change the analysis.  First, it is noted that the "integrated interdisciplinary summary note" containing this observation also noted that Mr. Reese was "independent in all [activities of daily living]," was "friendly, open to help, interested in making changes to improve self," and had "good work skills, work ethics."  (Tr. 733-34.)  More importantly, this single observation must be weighed against all of the other normal mental status examinations in the record which reflect that Mr. Reese presented with appropriate grooming and hygiene.  (*See, e.g.,* Tr. 568, 601, 620, 622, 651, 1253, 1293, 1296.)

For all of the reasons stated above, the undersigned concludes that the ALJ's findings of no more than mild to moderate limitations in each of the three challenged "B" criteria categories of mental functioning were supported by substantial evidence.  This Court must accordingly defer to those findings, regardless of whether additional evidence cited by Mr. Reese could support greater limitations.  *See Ulman*, 693 F.3d at 714.

### 3.    Whether ALJ Erred in Failing to Assess Headaches Under SSR 19-4p

Mr. Reese next asserts that the ALJ erred in failing to consider whether the medical evidence pertaining to his headaches satisfied the criteria of SSR 19-4p, which provides "that headaches should be considered as equaling listing 11.02."  (ECF Doc. 17 p. 20.)  Specifically, he argues that the ALJ erred in describing his headache treatments, and in failing to find based

on his self-reported headache frequency "that [he] equaled Listing 11.02 A or B."  (*Id.*)  The Commissioner responds that the ALJ was not required to consider Listing 11.02 because he did not find Mr. Reese's headaches to be a severe impairment, and argues Mr. Reese cannot establish that the requirements to medically equal Listing 11.02 have been met.  (ECF Doc. 21 pp. 25-26.)

SSR 19-4p provides guidance on how "primary headache disorders" such as migraines, chronic tension-type headaches, and trigeminal autonomic cephalalgias / cluster headaches are established and evaluated.  *See* SSR 19-4p, 84 Fed. Reg. 44667, 44667-71 (Aug 26, 2019).  The "primary headache disorders" that are addressed in SSR 19-4p are explicitly distinguished from "secondary headaches (for example, headache attributed to trauma or injury to the head or neck or to infection)," which the Ruling explains cannot be considered as medically determinable impairments because they "are symptoms of another underlying medical condition."  SSR 19-4p, 84 Fed. Reg. 44667, 44670.

Here, the ALJ did not identify a primary headache disorder as a severe medically determinable impairment at Step Two (Tr. 18), and Mr. Reese has not challenged the Step Two findings.  Instead, the ALJ found Mr. Reese's traumatic brain injury to be a severe impairment (Tr. 18), and concluded that his allegation of headaches was consistent with that impairment (Tr. 22).  In keeping with those findings, the ALJ considered Listing 11.18 at Step Three, which relates to traumatic brain injury.  (Tr. 19.)  Mr. Reese has also not challenged that finding.

Although he did not challenge the ALJ's decision not to identify a primary headache disorder as a severe impairment at Step Two, Mr. Reese nevertheless seeks a finding that the ALJ erred at Step Three by failing to apply a Social Security Ruling that is applicable only to primary headache disorders.  Because the application of SSR 19-4p is only appropriate for a primary headache disorder, as opposed to "secondary headaches" stemming from other medical

44

impairments or causes, the undersigned must consider whether the ALJ's decision not to identify a primary headache disorder as a severe impairment was supported by substantial evidence.

The most in-depth treatment records for Mr. Reese's headaches all predate the alleged onset date in 2016.  In those records, neurologist Dr. Reichers at the VA TBI clinic diagnosed Mr. Reese with "chronic daily headaches with mixed features" after an examination in 2012, opining that the headaches "seem[ed] to be greatly influenced by his impaired sleep" and noting a suspicion that "ongoing NSAID use [wa]s impacting his headaches." (Tr. 1185.)  Dr. Reichers referred Mr. Reese to behavioral medicine for nonphamacologic tools to treat sleep and headaches, and ordered a trial of promethazine as an abortive medication. (*Id.*)

 Mr. Reese returned to Dr. Reichers for a neurological examination in 2015, where Dr. Reichers again diagnosed chronic daily headaches with mixed features, noting the headaches were "daily in occurrence and likely have a component of analgesic rebound involved." (Tr. 518.)  According to Dr. Reichers, Mr. Reese complained of some "milder headaches" with "holocranial aching pain," for which he usually took Tylenol for relief, and also some more severe headaches that were sharp and throbbing throughout the head, lasting about an hour with associated phonophobia and photophobia, for which he would take promethazine and try to lay down. (Tr. 516.)  Dr. Reichers noted that Mr. Reese had not followed up with the behavioral medicine referral given at the prior assessment, and renewed that referral. (Tr. 518.)  He also continued Mr. Reese's promethazine. (*Id.*)

In a July 2015 VA C&P examination, neurologist Dariush Saghafi examined Mr. Reese and opined that his symptoms of "mild or occasional headaches" did not interfere with work or activities of daily living, and further opined that Mr. Reese's headaches and other asserted symptoms were more likely than not related to peripheral psychological issues. (Tr. 403-405.)

He also noted the likely influence of medication overuse, with Mr. Reese reporting the use of 6-8 Tramadol and 8-10 promethazine at a frequency of two to three times per week. (Tr. 406.)

The record reflects that Mr. Reese did not follow up with the TBI clinic after April 2015, although the clinic remained available as needed.  (Tr. 710-711.)  Indeed, there is no evidence of any neurological examination or treatment since the alleged onset date in 2016.  The undersigned is also unaware of any evidence indicating that Mr. Reese followed up on Dr. Reichers' repeated referrals to behavioral medicine for nonpharmacological tools to treat his headaches.  Instead, treatment records since the alleged onset date are limited to primary care assessments of "H/A" (shorthand for headaches) with a continued prescription for promethazine and some noted medication non-adherence (Tr. 609-610, 636-637, 697-699), as well as a prescription for topiramate added in April of 2019 (Tr. 548-550).  At his March 2020 hearing, Mr. Reese testified that his headaches were classified as cluster headaches, and that topiramate reduced their frequency from daily to twice per week.  (Tr. 85-86.)

Although the medical records do reflect past and ongoing treatment for headaches, they are not clear or specific as to the cause and/or classification of those headaches, with neurological findings suggesting multifactorial causes that may include history of TBI, psychological issues, and medication overuse.  The undersigned is not aware of evidence indicating that the headaches meet the diagnostic criteria for any primary headache disorder as outlined in SSR 19-4p, *see* 84 Fed. Reg. 44667, 44669-44670, and Mr. Reese has provided neither argument nor evidence demonstrating that such a diagnosis has been established as a medically determinable impairment in the existing record.  The ALJ's findings clearly indicate that he considered the headaches as symptoms of Mr. Reese's severe TBI, rather than a separate severe impairment, and treated them as secondary headaches that are not subject to SSR 19-4p.

For the reasons set forth above, the undersigned concludes that the ALJ's treatment of Mr. Reese's headaches as secondary headaches was supported by substantial evidence, as was his implicit finding that the record does not support a severe primary headache disorder.[6]  Given the absence of a severe primary headache disorder in the record, Mr. Reese cannot meet his burden to demonstrate that the ALJ erred in failing to discuss SSR 19-4p or Listing 11.02.

Even if an analysis of Mr. Reese's headaches under SSR 19-4p and Listing 11.02 were appropriate in this case, the undersigned finds that Mr. Reese has also failed to prove that an "equals Listing" finding was dictated by the evidence in the record.  SSR 19-4p provides guidance regarding a Listings analysis for primary headache disorders, stating in pertinent part:

> Primary headache disorder is not a listed impairment in the Listing of Impairments (listings);[] however, we may find that a primary headache disorder, alone or in combination with another impairment(s), medically equals a listing.[]
>
> Epilepsy (listing 11.02) is the most closely analogous listed impairment for an MDI of a primary headache disorder. While uncommon, a person with a primary headache disorder may exhibit equivalent signs and limitations to those detailed in listing 11.02 (paragraph B or D for dyscognitive seizures), and we may find that his or her MDI(s) medically equals the listing.
>
> Paragraph B of listing 11.02 requires dyscognitive seizures occurring at least once a week for at least 3 consecutive months despite adherence to prescribed treatment. To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02B, we consider: A detailed description from an AMS of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations).

[6] Even if the records did support a medically determinable "primary headache disorder," the undersigned notes that there is substantial evidence to support a finding that any such disorder was non-severe, given the limited and conservative treatment for headaches during the relevant time period.  (Tr. 548-550, 609-610, 636-637, 697-699.)

SSR 19-4p, 84 Fed. Reg. 44667, 44670-71.

Mr. Reese argues that the ALJ erred in failing to find based on his self-reported headache frequency "that [he] equaled Listing 11.02 A or B."  (ECF Doc. 17 p. 20.)  It is noted that SSR 19-4p does not provide for an "equals Listings" analysis of primary headache disorders under Listing 11.02 A, which relates to generalized tonic-clonic seizures, but only under Listings 11.02 B and D, which address dyscognitive seizures.  SSR 19-4p, 84 Fed. Reg. 44667, 44671.  Thus, Mr. Reese's argument will only be addressed as it relates to Listing 11.02 B.  Upon reviewing the evidence in the case, the undersigned finds that the record does not support a finding that the ALJ erred in failing to hold that Mr. Reese's headaches medically equaled Listing 11.02 B.

SSR 19-4p provides that an 11.02 B analysis should consider "[a] detailed description from an AMS [acceptable medical source] of a typical headache event, including all associated phenomena …; the frequency of headache events; adherence to prescribed treatment; side effects of treatment …; and limitations in functioning…" SSR 19-4p, 84 Fed. Reg. 44667, 44671.  In so stating, the Ruling not only emphasizes the importance of considering measures of both the frequency and severity of reported headaches, but also highlights that those factors should be established in part by contemporaneous reports to treating providers.  *See id.; see also Jandt v. Saul*, No. 1:20-CV-00045, 2021 WL 467200, at *8 (W.D. Ky. Feb. 9, 2021) ("evidence regarding the frequency and severity of the migraines must be considered in assessing whether a claimant's migraine impairment medically equals Listing 11.02"), *10 ("[T]he ALJ's focus should have been on records from the treating sources memorializing Plaintiff's statements regarding: her symptoms such as aura, the intensity and type of headache pain, nausea, photophobia, the need to lie down in a quiet dark room, medications prescribed, and the duration and frequency of the headaches." (emphasis added)).

Here, the only detailed description of Mr. Reese's headaches by an acceptable medical source was in January 2015, over a year before the alleged onset date and over five years before his hearing in the matter.  (Tr. 516.)  Mr. Reese's contemporaneous reports to the providers who treated his headaches after the alleged onset date are limited to the following: "bad H/A- whole head, no blurred or double vision, no hearing loss, no tinnitus" (Tr. 550), "Patient reports no change in Quality or Location of Pain" since an initial 2014 pain assessment (Tr. 610, 700), "medications helps when he gets them," and "non-adherance- takes more than recommended medications often of several meds" (Tr. 550, 609, 637, 699).  These limited reports lack the detailed descriptions of headache events contemplated in SSR 19-4p, and are not sufficiently explicit as to the frequency, severity, and associated symptoms of Mr. Reese's headaches to support an equals Listings analysis under SSR 19-4p and Listing 11.02.  The records also note repeated medication nonadherence and reflect only very conservative treatment, limited to a single medication from 2015 through April 2019, when a second medication was added.  (Tr. 548-550, 609-610, 636-637, 697-699.)  Neither the ALJ's observation that headache medication promethazine may also treat sinusitis (Tr. 22, 24) nor his failure to specifically identify the more recently prescribed topiramate as a treatment, alters this analysis.  It remains clear that the sparse medical treatment records in this case cannot support the level of frequently or severity of headaches necessary to support a finding that his headaches medically equaled listing 11.02 B.

Mr. Reese's citation to *Harper v. Commissioner* also does not change the analysis. Instead, it is illustrative of the weaknesses in Mr. Reese's argument, as the *Harper* court addressed a "distinct diagnosis" of migraine headaches, for which the plaintiff had received extensive "specialized treatment" including, at various times, Fioricet, Imatrex, Pamelor,

Topamax, Depakote and Botox injections.  *Harper v. Comm'r of Soc. Sec.*, No. 1:20cv1304, 2021 WL 2383833, *1, *12 (N.D. Ohio May 25, 2021).

Although the ALJ in this case did not provide an explicit discussion of Listing 11.02 B – and was not required to do so for the reasons set forth above – he did ultimately conclude that the record was "consistent with the claimant's allegations of headaches, [but] when considered as a whole, is not supportive of the contention that the existence of this impairment would be preclusive of all types of work."  (Tr. 22.)  This finding is supported by substantial evidence, and the undersigned finds that Mr. Reese has failed to meet his burden at Step Three to prove that his headaches medically equaled Listing 11.02 B.

### 4.     Whether ALJ Properly Analyzed Obesity Under SSR 19-2p

Mr. Reese also asserts that the ALJ erred by failing to thoroughly analyze his obesity "in conjunction with his other impairments," as required by SSR 19-2p.  (ECF Doc. 17 p. 16-17.)  In particular, he argues the ALJ failed to consider the impact of obesity on his knee impairments.  (*Id.*)  The Commissioner responds that substantial evidence supports the ALJ's evaluation of Mr. Reese's obesity, and the ALJ's analysis complied with SSR 19-2p.  (ECF Doc. 21 p. 26-27.)

On May 20, 2019, the Social Security Administration published SSR 19-2p, which rescinded and replaced the guidelines for evaluating obesity under SSR 02-1p.   Social Security Ruling 19-2p "provides guidance on how [SSA] establish[es] that a person has a medically determinable impairment of obesity," and how SSA "evaluate[s] obesity in disability claims." SSR 19-2p, 84 Fed. Reg. 22924, 22924 (May 20, 2019).  In particular, SSR 19-2p provides that "[t]he combined effects of obesity with other impairment(s) may be greater than the effects of each of the impairments considered separately," and that the RFC should account for "the effect obesity has upon the person's ability to perform routine movement and necessary physical

50

activity within the work environment." *Id.* at 22925; *see also Miller v. Commissioner*, 811 F.3d 825, 835 (6th Cir. 2016) (noting that SSR 02-1p, the predecessor to SSR 19-2p, "directs an ALJ to consider the claimant's obesity, in combination with other impairments, at all stages of the sequential evaluation") (citations omitted).

Mr. Reese contends that the ALJ did not meet the requirements of SSR 19-2p because he did not consider the combined effects of Mr. Reese's obesity and knee impairments.  (ECF Doc. 17 p. 16-17.)  A review of the decision as a whole does not support this argument.  The ALJ first considered Mr. Reese's obesity and bilateral knee osteoarthritis of the at Step Two, where he found both impairments to be "severe" impairments that "significantly limit the ability to perform basic work activities."  (Tr. 18.)  The ALJ next considered Mr. Reese's obesity and osteoarthritis in his Step Three Listings analysis, where he held:

> In reaching the conclusion that the claimant's impairments do not rise to listing level, I considered the effect his obesity has on his other impairments and on his ability to perform routine movement and necessary physical activity within the work environment. I also considered how his obesity might cause fatigue that would affect his ability to function physically pursuant to Social Security Ruling 19-2p. Because the physical examinations contained in the record were mostly unremarkable, I do not find that the claimant's obesity either singularly or in combination with his other medically determinable severe impairments results in limitations greater than those assessed in this opinion.
>
> ***
> Relevant to listing 1.02, radiographic study of the bilateral knees (B1F/36), does not indicate the "gross anatomical deformity" contemplated in the listings.  Clinical examination in the record describes a normal gait and station (B6F/26), and the claimant walks to accomplish various household errands (B5E/4), (B4F/4).  The evidence does not indicate that the claimant is unable to ambulate effectively.

(Tr. 18 (emphasis added), 19.)  The ALJ further discussed Mr. Reese's obesity and osteoarthritis at Step Four, explaining:

> In terms of the claimant's alleged obesity, he recorded a body weight of 242 pounds on July 28, 2016 (B3F/283), which corresponds to a body mass index in excess of thirty-nine. In turn, this is consistent with a body weight of 245 pounds, recorded

51

on October 3, 2018 (B3F/165), and a body weight of 250 pounds, recorded on August 13, 2019 (B6F/27). Although no direct medical evidence indicates that the existence of this impairment causes the claimant excess fatigue, or unduly restricts his ability to move about freely within the workplace, <u>I nevertheless identify this impairment as severe for its contributory effects, potentially marked, on the claimant's other severe impairments, particularly those affecting his weight bearing, musculoskeletal system.</u>

In terms of the claimant's alleged osteoarthritis of the bilateral knees, radiographic study of the bilateral knees, dated October 4, 2018, indicated mild degenerative changes to the bilateral knees (B1F/36). While this finding would be consistent with the claimant's allegations of a knee injury, the record, when considered as a whole, is not supportive of the contention that the existence of this impairment would be preclusive of all types of work.

Clinical examinations included in the record have consistently reported pain with range of motion testing (B3F/284), (B5F/45), but the claimant has treated only with the use of a knee brace (B1F/24).

Otherwise, the claimant has not attempted a course of physical therapy, he neither uses (B6F/25-26), nor discernably has used (B3E/4), (B8E/4), any course of medications other than "over-the-counter" acetaminophen (B6F/25), and his request for a cortisone injection was declined, owing to the mild nature of the arthritis (B1F/22).

(Tr. 21-22 (emphasis added).)  Finally, in analyzing the opinion evidence, the ALJ explained:

The record shows an obese claimant, compounding the effects of knee arthritis, but mild on radiographic study (B1F/36), not warranting injection therapy (B1F/22). … The claimant has retained an array of activities of daily living of sufficient breadth to encompass the maintenance of an independent household (B5E/1), and collecting "scrap" metals for cash (B7F/1). Restriction to light work is appropriate for this combination of impairments; however, the claimant's knee impairment warrants some additional postural limitations, imposing the greatest restriction on those maneuvers that most bring the knees into play.

(Tr. 24-25.)

The above discussion clearly reflects that the ALJ considered the interaction of Mr. Reese's obesity with his mild knee arthritis under SSR 19-2p, and reached well-supported conclusions that Mr. Reese did not meet Listing 1.02 and was capable of performing work subject to the specific physical RFC limitations adopted at Step Four.  Mr. Reese argues that the ALJ's "brief and perfunctory analysis failed to comply with the analysis required by SSR 19-

2p," but the undersigned finds that the ALJ's analysis was neither brief nor perfunctory.
Notably, Mr. Reese has not identified record evidence what was omitted or misstated by the ALJ
which should have been considered in the above analysis.

SSR 19-2p specifically instructs ALJs not to "make any general assumptions about the
severity or functional effects of obesity combined with other impairment(s)," but rather to
"evaluate each case based on the information in the case record."  SSR 19-2p, 84 Fed. Reg.
22924, 22924.  That is clearly what the ALJ did in this case.  Indeed, in situations where the
potential impact of obesity was described much more generally, the Sixth Circuit has recognized
that "[t]he absence of further elaboration on the issue of obesity likely stems from the fact that
[plaintiff] failed to present evidence of any functional limitations resulting specifically from her
obesity."  *Essary v. Comm'r of Soc. Sec.*, 114 F. App'x 662, 667 (6th Cir. 2004) (citing *Forte v.
Barnhart*, 377 F.3d 892, 896 (8th Cir.2004) (rejecting "argument that the ALJ erred in failing to
consider his obesity in assessing his RFC," because "[a]lthough his treating doctors noted that
[the claimant] was obese and should lose weight, none of them suggested his obesity imposed
any additional work-related limitations, and he did not testify that his obesity imposed additional
restrictions")); *see also Gray v. Comm'r of Soc. Sec.*, No. 20-10099, 2021 WL 298826, at *6
(E.D. Mich. Jan. 11, 2021) (finding limited findings regarding obesity sufficient where "there is
no medical evidence in the record indicating that [plaintiff's] obesity increases the severity of her
functional limitations or other impairments"), *report and recommendation adopted*, No. 20-
10099, 2021 WL 289422 (E.D. Mich. Jan. 28, 2021).  Likewise in this case, Mr. Reese has not
identified any evidence not addressed by the ALJ which suggests that his obesity significantly
exacerbated any of his other impairments.

For all of the reasons discussed above, the undersigned finds that the ALJ in this case repeatedly and expressly considered the impact of Mr. Reese's obesity on his other impairments, particularly his mild knee osteoarthritis.  Based on those considerations, the ALJ made findings supported by specific evidence in the record, and reached conclusions at Step Three and Four that were supported by substantial evidence.  Although Mr. Reese bears the burden at both Steps Three and Four, he has presented no argument or evidence demonstrating that the ALJ's analysis or conclusions were in error.  Accordingly, the undersigned finds that Mr. Reese has failed to prove that the ALJ erred in considering the impact of his obesity under SSR 19-2p.

### 5.     Whether ALJ Erred by Failing to Consider Effects of Residual Pain

Mr. Reese finally asserts that the ALJ erred because he "failed to consider the residual effects of [his] bilateral knee arthritis, headaches, and the related pain."  (ECF Doc. 17 p. 21.) He argues that the case should be remanded "to consider whether the effects of his pain symptoms, documented by x-ray evidence, would interfere with his ability to engage in substantial gainful activity."  (*Id*.) (internal citation omitted).  The Commissioner responds that the ALJ "thoroughly discussed" Mr. Reese's testimony and his subjective complaints, and supported his RFC determination with substantial evidence.  (ECF Doc. 21 p. 31-32.)

"[A]n ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003); *see also Alexander v. Kijakazi*, No. 1:20-cv-1549, 2021 WL 4459700, *13 (N.D. Ohio Sept. 29, 2021) ("An ALJ is not required to accept a claimant's subjective complaints.") (citing *Jones*, 336 F.3d at 476); *see also* 20 C.F.R. § 404.1529(a) *and* SSR 16-3p, 81 Fed. Reg. 14166, 14167 (March 16, 2016) (republished as 82 Fed. Reg. 49462 (Oct. 25, 2017) as to applicable date and to update citations to reflect revisions

to regulations effective March 27, 2017) (explaining that a claimant's statements of symptoms alone are not sufficient to establish the existence of a physical or mental impairment or disability).)  An ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility.  Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence."  *Calvin v. Comm'r of Soc. Sec.*, 437 F. App'x 370, 371 (6th Cir. 2011) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)).

SSR 16-3p rescinded and supersedes SSR 96-7p and eliminated "the use of the term 'credibility' from [the SSA's] sub-regulatory policy," because, as the SSA explained, the "regulations do not use this term."  SSR 16-3p, 82 Fed. Reg. 49462, 49463.  The revised regulations clarify "that subjective symptom evaluation is not an examination of an individual's character."  *Id*.  Rather, when determining "whether an individual's symptoms will reduce his or her corresponding capacities to perform work-related activities . . . the consistency of the individual's own statements" is considered.  *Id*. at 49464 (emphasis added); *see also Banks v. Comm'r of Soc. Sec.*, No. 2:18-cv-38, 2018 WL 6060449, *5 (S.D. Ohio Nov. 20, 2018) ("SSR 16-3p requires the ALJ to evaluate the consistency of a plaintiff's statements, without reaching the question of overall credibility, or character for truthfulness"), *report and recommendation adopted*, 2019 WL 187914 (S.D. Ohio Jan. 14, 2019).

Notwithstanding this change in terminology, courts in this Circuit have continued to use the term "credibility" when reviewing an ALJ's assessment of a claimant's symptoms and continue to rely on case law using the old terminology.  *See, e.g., Alexander*, 2021 WL 4459700, *14, n.11; *Young-Roach v. Soc. Sec. Adm.*, No. 1:20-cv-1853, 2021 WL 4553128, *10 (N.D. Ohio Oct. 5, 2021); *Banks*, 2018 WL 6060449 at *5.  These cases remain relevant because SSR

16-3p did not change the "two-step process" that an ALJ utilizes "when assessing the limiting effects of an individual's symptoms."  *Martin v. Kijakzi*, No. 1:20-CV-117, 2021 WL 4066985, *5 (E.D. Tenn. Sept. 7, 2021); *see also Hoffman v. Comm'r of Soc. Sec.*, No. 1:20-cv-138, 2021 WL 4145626, *5 (W.D. Mich. Sept. 13, 2021) (explaining that SSR 16-3p did not change "[t]he longstanding two-part analysis for evaluating symptoms.") (internal citations omitted).  Thus, to the extent the term "credibility" is used herein, it refers to the standard of review in governing caselaw, with the understanding that the current standard is more accurately described as one of "consistency."

Under the two-step process used to assess the limiting effects of a claimant's symptoms, a determination is first made as to whether there is an underlying medically determinable impairment that could reasonably be expected to produce the claimant's symptoms.  SSR 16-3p, 82 Fed. Reg. 49462, 49463; *Rogers v. Comm'r Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929(a)).  If that requirement is met, the second step is to evaluate the intensity and persistence of the claimant's symptoms to determine the extent to which they limit the claimant's ability to perform work-related activities.  SSR 16-3p, 82 Fed. Reg. 49462, 49464; *Rogers*, 486 F.3d at 247.  When the alleged symptom is pain, the ALJ should evaluate the severity of the alleged pain in light of all relevant evidence, including the factors set out in 20 C.F.R. § 404.1529(c).  *See Felisky v. Bowen*, 35 F.3d 1027, 1038-1039 (6th Cir. 1994).  The ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 82 Fed. Reg. 49462, 49467.  Nevertheless, an ALJ need not discuss all of the regulatory factors that she considers, except as she finds them pertinent to the case.  *Id*.

Mr. Reese did not specifically identify which subjective allegations he thought the ALJ should have more fully considered, except to assert that his allegations of pain are "supported by x-rays," citing imaging of his knees. (ECF Doc. 17 p. 21 (citing Tr. 455-58).)  This imaging, taken in October 2018, showed "mild degenerative changes of bilateral knees, slightly increased joint effusion on the right side, grossly unchanged on the left side."  (Tr. 455-56.)  The ALJ discussed and cited this evidence, explaining "[w]hile this finding would be consistent with the claimant's allegations of a knee injury, the record, when considered as a whole, is not supportive of the contention that the existence of this impairment would be preclusive of all types of work." (Tr. 22.)  The ALJ also noted that Mr. Reese's "last focused treatment" for his TBI was more than a year before the alleged onset date, and that his headache treatments during the disability period were limited to prescription medications, and found the record was "not supportive of the contention that the existence of this impairment would be preclusive of all types of work."  (*Id.*)

As a whole, the ALJ's decision contains "specific reasons for the weight given to the individual's symptoms," SSR 16–3p, 82 Fed. Reg. 49462, 49467. For the knee impairment, the ALJ acknowledged that clinical examinations "have consistently reported pain with range of motion testing," but noted treatment for the knee impairment was limited to a knee brace and acetaminophen, he had not participated in physical therapy, he reported walking to accomplish household errands, "and his request for a cortisone injection was declined, owing to the mild nature of the arthritis."  (Tr. 19, 22.)  The ALJ's consideration of Mr. Reese's headaches was discussed at length in Section VI.C.3., *supra*, and is also consistent with his finding that those symptoms would not be preclusive of work as specified in the RFC.  The ALJ's findings regarding Mr. Reese's subjective complaints are therefore "consistent with and supported by the

evidence" and "clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms."  SSR 16–3p, 82 Fed. Reg. 49462, 49467.

As explained above, "'[t]he substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'"  *Blakely*, 581 F.3d at 406 (internal quotation omitted).  Based on the decision and the record before this Court, the undersigned finds that the ALJ properly considered and weighed the evidence and did not err in his evaluation of Mr. Reese's subjective allegations.

## VII.    CONCLUSION

For the foregoing reasons, the undersigned recommends that the final decision of the Commissioner be **AFFIRMED**.

/s/Amanda M. Knapp

January 31, 2022

_____
AMANDA M. KNAPP
United States Magistrate Judge

## **OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).